**Bill DALTON, Plaintiff,**

v.

**JEFFERSON SMURFIT CORPORATION (U.S.), et al., Defendants.**

No. C–1–97–207.

United States District Court,
S.D. Ohio,
Western Division.

Sept. 30, 1997.

1188

Alphonse Adam Gerhardstein, Sarah Poston, Cincinnati, OH, for plaintiff.

George Edward Yund, David A. Skidmore, Jr., Frost & Jacobs, Cincinnati, OH, for defendants.

## ORDER GRANTING IN PART AND DENYING IN PART THE DEFENDANTS' MOTION TO DISMISS

DLOTT, District Judge.

Few areas of the legal landscape are cast in as many shades of gray as where the laws governing the unionized workplace have intersected with the nation's antidiscrimination laws. The questions presented in this case require exploration of this murky terrain.

Advancing both federal and state law claims, the Plaintiff, a former union employee, has filed an action which challenges the manner in which he was treated at his previous place of employment. His complaint sets forth four causes of action. The federal law counts allege violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and provisions of the Civil Rights Act of 1866, 42 U.S.C. § 1981. The remaining counts, all brought as pendent state law claims, include a cause of action for violations

of the Ohio Civil Rights Act, OHIO REV. CODE ANN. 4112.01 *et seq.* (Anderson 1995), and a second cause of action for the tort of intentional infliction of emotional distress.[1]

The litigation is presently before the Court on the Defendants' Motion to Dismiss for want of subject matter jurisdiction, FED. R. CIV. P. 12(b)(1), and for failure to state a claim upon which relief may he granted. FED. R. CIV. P. 12(b)(6). For reasons more fully explained below, the Defendants' Motion to Dismiss is hereby **GRANTED IN PART AND DENIED IN PART.**

Before narrating the relevant facts, the Court observes that, for purposes of their Motion to Dismiss, the Defendants have not challenged the factual allegations contained in the complaint, nor has the Plaintiff questioned the accuracy of the collective bargaining agreement attached as an exhibit to the Defendants' Motion to Dismiss.

## I. BACKGROUND

### A. The Unionized Work Setting and the Collective Bargaining Agreement

Jefferson Smurfit Corporation ("JSC") manufactures corrugated materials, including boxes and displays. Bill Dalton, an African–American, worked as a pipefitter in the maintenance department at JSC's Blue Ash, Ohio manufacturing plant. This plant, along with several other JSC facilities, operates against the backdrop of a unionized work force.

The racial composition of the union membership at the Blue Ash plant, however, is not as symmetrical as the boxes its members help to manufacture. Of the one hundred fifty union members working at the plant, only nine are African–American. Despite this lopsided disparity in numbers, Dalton joined the United Paperworkers International Union, AFL–CIO, Local No. 498 (the "Union"), when he started work at JSC in 1984. As a result, the terms and conditions of Dalton's employment were regulated by the provisions contained in the collective bargaining agreement negotiated between JSC and the Union.

That agreement contained a number of provisions delineating the respective rights and obligations of JSC and its union employees. JSC was authorized to impose discipline on an employee, up to and including discharge, for "justifiable reasons." One reason articulated in the agreement as a proper basis for such discipline was an employee's inability to "cooperate with the local management." Employees for their part, agreed to show up to work at the beginning of their scheduled shift. If employees were unable to meet this obligation due to sickness or for "other legitimate reasons," they were to notify JSC's local management "as soon as possible." In addition, employees working at "operations that by their nature are continuous"[2] could not leave their work station until they were told otherwise by their supervisor or "until someone ha[d] taken over the responsibility of their respective position." The agreement also provided that neither JSC nor the Union would discriminate against an employee with regard "to [their] compensation, terms, conditions or privileges of employment" on the basis of "race, color, religion, sex, age, handicap or national origin." In complying with this nondiscrimination clause, both JSC and the Union agreed that they were "subject to the specific provisions and exemptions" of various federal antidiscrimination statutes, including Title VII of the Civil Rights Act of 1964.

As is standard in most agreements reached in a unionized setting, the collective bargaining agreement also contained a section providing a grievance and arbitration mechanism to resolve workplace disputes. In order to set the machinery of the grievance process in motion, the aggrieved employee was required to file a complaint with his or her immediate supervisor. The individual employee's participation in the process, however, began and ended with the

---

1. The Plaintiff has brought the intentional infliction of emotional distress claim against the Defendant James Boyd only.

2. This phrase was defined by the collective bargaining agreement as including "paper mills, power plants, combiners, and [those places] elsewhere defined in the Exhibits." Despite the opportunity to expand the coverage of this provision, nowhere in their addendum to the collective bargaining agreement did JSC and Local No. 498 further delineate the job activities which would fall within the provision's ambit.

filing of the complaint. All subsequent steps in the grievance process were handled through discussions between a representative for *the Union* and local management. The agreement also provided that if a dispute was not satisfactorily settled through the grievance process, the matter could be submitted to binding arbitration. However, only the Union had the authority to request that grievances be submitted to binding arbitration. In addition, arbitration was only appropriate for resolving disputes that involved "the interpretation, application or compliance with the terms" of the agreement. The arbitrator could not "change any of [the] terms or conditions" in the agreement nor "deprive the Company or the Union of any rights expressly or impliedly reserved therein." The parties agreed that the expenses of such arbitration were to be shared equally between the Union and JSC. Therefore, throughout the entire grievance and arbitration process, the aggrieved employee was stripped of any control over the direction or the manner in which his or her complaint was handled. In short, it was the Union that owned the individual employee's grievance for purposes of resolving workplace disputes.

### B. The Dispute

Shortly after beginning his work duties in the maintenance department and for the remainder of his stay in that department, Dalton endured a "constant stream of racial epithets"[3] and threats of physical harm from the defendant James Boyd, a co-worker in the maintenance department. In addition to this verbal barrage of racial abuse, Boyd took more concrete action. On numerous occasions, while Dalton was being lifted on a cherry-picker to perform repair work above ground, Boyd would operate the machine so as to knock Dalton against the ceiling and the walls.

In October 1994, the supervisor position for the maintenance department became available. Boyd applied for this position. Perturbed with the prospect of Boyd as his immediate supervisor, Dalton approached the defendant John Brooks, the production manager at the Blue Ash plant, to voice his concerns. Brooks attempted to assuage Dalton's fears by assuring him that Boyd had changed and that he would no longer engage in such racially motivated conduct. Soon thereafter, Boyd was promoted to the supervisor position.

Despite the assurances that had been given, Boyd continued his prior practice of hurling racial slurs at Dalton. With his new found position of authority, Boyd also explored new avenues to express his racist views. For example, unlike the assignments to other employees in the maintenance department, Boyd regularly assigned more work to Dalton than could be accomplished in the assigned period of time. Boyd also used Dalton's health condition as a means to act on his racist impulses.

In November 1994, Dalton was diagnosed with atrial fibrillation, a condition characterized by the rapid beating of the heart resulting in dizziness and weakness. After being diagnosed, Dalton returned to his normal job duties at JSC. On February 13, 1995, while on duty at work, Dalton began to experience the symptoms of atrial fibrillation. Dalton immediately called his doctor to seek his advice and assistance. Dalton's physician informed him to leave work immediately and to go to the Good Samaritan Hospital. Throughout this telephone conversation Boyd was standing nearby in the same room. However, in spite of his knowledge of Dalton's physical condition and the instructions from his physician, Boyd refused Dalton's request to leave work to go to the hospital. Instead, Dalton was forced to stay at work until he had completed his shift. As a result, Dalton remained at work for an additional three hours before he was able to leave for the hospital. Once at Good Samaritan Hospital, Dalton remained hospitalized for three days.

Upon his return to work, Dalton was asked to report to a meeting being held in defendant Tom Wiechel's office. At the time, Wiechel was the plant superintendent at the Blue Ash facility, a position which gave him supervisory control over Boyd and Brooks. Also present at this meeting was Boyd and John

---

**3.** Examples of such epithets included references to Dalton as the "big, black, dumb son of a bitch" and the observation that Dalton "should be back in Africa with a spear in one hand and a basketball in the other." Compl. ¶ 12.

Wiggens, union president for Local 498. During this meeting, Wiechel warned Dalton to get along with Boyd and apprised Dalton that he would support Boyd in any future disputes. Afterwards, Brooks informed Dalton to do his job and to ignore Boyd.

Beginning the next day, Boyd continued with his verbal harassment of Dalton. By April 1995, Boyd's frequent racially abusive comments had so infected the work environment in this maintenance department that Dalton decided to bid on a position in the printing department even though the position entitled him to a lower hourly wage. Dalton was transferred in May to this position in the printing department.

Despite Dalton's attempt to extricate himself from the racially hostile work environment in the maintenance department, the specter of racial intolerance followed Dalton to his new position in the printing department. Ironically, much of this intolerance was attributable to the conduct of Dalton's immediate supervisor in the printing department, the defendant Tom Wholihan. However, unlike his counterpart Boyd, Wholihan limited his expression of racial intolerance to the recital of racially abusive comments.[4]

On June 30, 1995, Dalton filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging racial harassment and intimidation by Boyd and other management employees. During the course of the EEOC's investigation into the complaint, the defendant Richard Flamm, general manager of the Blue Ash plant, held a plant-wide meeting to discuss the recent "racial problems" at the plant. During this meeting, Flamm informed all of the employees that JSC would not tolerate racism and that if there was a finding that plant management had engaged in racial discrimination there could be lay-offs. Despite this attempt to mollify the racial tension at the plant, the level of racial intolerance only became heightened.

In the fall of 1996, a co-worker in the printing department, Randall Robinson, informed Dalton that he possessed an AK–47 assault weapon and that Dalton was at the top of his "hit list." According to Dalton, his supervisor, Wholihan, had been present during conversations between Robinson and a co-worker, Justo Perez, in which the three discussed Robinson's gun ownership and his "hit list." Despite Wholihan's apparent complicity in and approval of Robinson's course of conduct, Dalton asked him to separate Perez and Robinson because Dalton feared that Perez's influence might cause Robinson to become violent. Wholihan, however, took no action to prevent an eruption of violence. On October 28, 1996, Perez filed a complaint against Dalton as a result of a conversation the two had five days earlier. The same day, Dalton filed a complaint against Perez and Robinson for harassment as a result of the same conversation as well as their threats of gun violence.

JSC formed a management team to investigate the complaints. One of the members of the management team was Wiechel, one of the individuals named in Dalton's June 1995 EEOC complaint. JSC management questioned Dalton at length over the facts surrounding Perez's complaint. After completing their investigation on November 7, 1996, Dalton was found to have "engaged in threatening and intimating behavior directed at" Perez and was suspended from work for three days and ordered to seek counseling. JSC also threatened to discharge Dalton if he was "involved in this type of activity" in the future. Although Dalton was disciplined neither Perez nor Robinson received any sanction for their conduct. Becoming increasingly depressed as a result of the racially hostile work environment at the Blue Ash plant, Dalton resigned his position at JSC on November 18, 1996. Not long thereafter, Dalton filed a complaint with the EEOC alleging retaliation.[5]

---

**4.** Examples of such comments include the following: "On one occasion Wholihan was showing Dalton how to mix ink to create JSC's standard color. After Wholihan finished putting black ink into the mix, he told Dalton that instead of adding the black color, he could have just had Dalton dip his hand into the ink.", Compl. ¶ 21, and "[i]n the fall of 1996, Dalton was out of work with the flu. When he returned

to work, Wholihan told him he hoped Dalton did not have the Ebola virus that they have over in Africa." Compl. ¶ 22.

**5.** The Court understands that the parties are in agreement that a right to sue letter is forthcoming from the EEOC regarding the racial harassment claim and the retaliation claim. Although the Defendants have not moved to dismiss the

On January 23, 1997, Dalton filed suit in the Hamilton County Court of Common Pleas setting forth the causes of action previously discussed. In his complaint, Dalton asked for compensatory and punitive damages as well as for reasonable attorney's fees. The Defendants then removed the action to this Court on February 24, 1997. In their motion to dismiss, the Defendants have attempted to parry the panoply of claims set forth in the complaint in three ways. First, the Defendants proclaim that Dalton's Title VII (and apparently his § 1981) claim should be dismissed for lack of subject matter jurisdiction because the collective bargaining agreement compels Dalton to arbitrate these claims. If the Title VII and the § 1981 claims were to be dismissed, so too would the remaining pendent state law claims. However, should this first defense fail, the Defendants next argue that Dalton's state law claims for a racially hostile work environment, retaliation and intentional infliction of emotional distress should be dismissed for lack of subject matter jurisdiction because those claims are preempted by § 301 of the Labor Management Relations Act ("LMRA"). Thus, the resolution of these claims should also be submitted to the grievance and arbitration machinery contained in the collective bargaining agreement. Finally, the Defendants' last line of defense, i.e., their 12(b)(6) motion, seeks to counter Dalton's attempt to hold the individual Defendants liable under Title VII, § 1981 and the Ohio Civil Rights Act by advancing the argument that individuals are insulated from liability under those statutes.

## II. *Legal Standards*

### A. *Lack of Subject Matter Jurisdiction— Federal Rule of Civil Procedure 12(b)(1)*

■ Preliminarily, the Court must determine whether the Defendants' arguments re-

garding arbitration and § 301 preemption are more properly brought under Rule 12(b)(6) or Rule 12(b)(1). The Sixth Circuit has held that determining under which rule a motion should be analyzed turns upon the effect a dismissal of the action would have on a plaintiffs ability to litigate their claims elsewhere. *Rogers v. Stratton Indus., Inc.*, 798 F.2d 913. 917 (6th Cir.1986). If a plaintiff's claims are forever extinguished as a result of the dismissal (a result usually produced by a court passing on the merits of the plaintiff's claims), then the motion should be treated as one brought under Rule 12(b)(6). *Id.* If however, no obstacle stands in the way of a plaintiff litigating his or her claims as a result of the dismissal, then a court should treat the motion as one under Rule 12(b)(1). *Id.* When a defendant's argument is that the plaintiffs claim must be submitted to an arbitral forum instead of a judicial forum, the dismissal of the plaintiffs suit in federal court does not prevent a plaintiff from litigating the merits of his or her claim. To the contrary, such dismissal merely transfers the forum in which the litigation on the merits will occur. Therefore, a motion to dismiss premised upon the argument that a plaintiff's claim must be submitted to arbitration is properly analyzed under Rule 12(b)(1). *Lorenz v. CSX Transp., Inc.*, 980 F.2d 263 (4th Cir.1992); *West Shore Pipe Line Co. v. Associated Elec. & Gas Ins. Serv., Ltd.*, 791 F.Supp. 200 (N.D.Ill.1992).

When a defendant attacks the Court's authority to hear and decide a case under Rule 12(b)(1), the Court must make the distinction between 12(b)(1) motions which attack the complaint on its face and those which attack the existence of subject matter jurisdiction in fact. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir.1996) (quoting *Mortensen v. First Fed. Sav. & Loan Assn.*, 549 F.2d 884, 890 (3rd Cir.

Plaintiff's Title VII claims due to the lack of an EEOC right to sue letter at this time, the right to sue letter is a prerequisite to this Court having jurisdiction over the Title VII claim. 42 U.S.C. § 2000e–5(f)(1).

However, for the sake of expediency, and because the parties agree that an EEOC letter is inevitably forthcoming, this Court will determine the Defendants' Motion to Dismiss as if the amended complaint with the right to sue letter

had already been filed. No prejudice will occur from this treatment. If the Plaintiff files an amended complaint after the right to sue letter has been received, the Defendants will no longer be entitled to dismiss based on the lack of a right to sue letter; if, however, the Plaintiff does not file an amended complaint after the right to sue letter is received, or if no right to sue letter is in fact received, the Defendants retain the right to raise this jurisdictional defense at a later date.

1977)). In a "facial attack," the basis of the challenge is not that the Court does not actually have jurisdiction over the case, but rather, that a plaintiff has failed to faithfully recite all the jurisdictional predicates necessary for the Court to exercise subject matter jurisdiction over the matter. *Id.* at 1134–35. For example, if in a case ostensibly premised upon the existence of diversity jurisdiction the complaint fails to allege that the amount in controversy exceeds $75,000, then a motion to dismiss must be granted even if in reality the amount in controversy in the case truly exceeds $75,000. When a party makes a "factual attack," however, the party is challenging the actual existence of the Court's jurisdiction over the matter, a defect that may exist even though the complaint contains the formal allegations necessary to invoke jurisdiction. *Id.* at 1134–35. As the Defendants' arguments do not challenge the sufficiency of the jurisdictional allegations in the Plaintiff's complaint, the Court will treat the Defendants' 12(b)(1) motion as a factual attack.

Under both forms of attack, the plaintiff has the burden of proving the existence of subject matter jurisdiction. *Rogers,* 798 F.2d at 915. If, however, the motion to dismiss is a facial attack, the plaintiffs burden "is not onerous." *Musson Theatrical, Inc. v. Federal Express Corp.,* 89 F.3d 1244, 1248 (6th Cir.1996). In such a situation, the Court must consider the allegations contained in the complaint to be true and draw all reasonable inferences in the plaintiff's favor. *Ezekiel v. Michel,* 66 F.3d 894, 897 (7th Cir.1995). Thus, the complaint should not be dismissed unless it appears beyond doubt that the plaintiff has failed to set forth any facts in the complaint which would provide the Court with jurisdiction. *Musson,* 89 F.3d at 1248.

When the attack is factual, however, the plaintiffs burden takes on added weight. In resolving a factual attack, no presumptive truthfulness applies to the complaint's factual allegations and the Court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *RMI,* 78 F.3d at 1134; *see also Ohio Nat'l Life Ins. Co. v. United States,* 922 F.2d 320, 325 (6th Cir.1990). When the facts are disputed, the Court "has broad discretion to consider affi-davits, documents outside the complaint, and to even conduct a limited evidentiary hearing if necessary." *Rudd v. Baker Furniture,* 967 F.Supp. 984, 989 (M.D.Tenn.1997). However, unlike a motion to dismiss under Rule 12(b)(6), the Court's consideration of matters outside the pleadings does not convert the Rule 12(b)(1) motion into one for summary judgment. *Rogers,* 798 F.2d at 915–16.

### B. Failure to State a Claim—Federal Rule of Civil Procedure 12(b)(6)

The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if all the facts and allegations in the complaint are taken as true. *Mayer v. Mylod,* 988 F.2d 635, 638 (6th Cir.1993) (citing *Nishiyama v. Dickson County Tennessee,* 814 F.2d 277, 279 (6th Cir.1987)). To that end, for purposes of dismissal under the rule, the complaint must be construed in the light most favorable to the nonmoving party and its allegations taken as true. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Miller v. Currie,* 50 F.3d 373, 377 (6th Cir.1995). To survive a motion to dismiss under Rule 12(b)(6), "a ... complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988) (citations and internal quotation marks omitted); *accord Columbia Natural Resources, Inc. v. Tatum,* 58 F.3d 1101 (6th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1041, 134 L.Ed.2d 189 (1996). The test for dismissal under Rule 12(b)(6), however, is a stringent one. "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 811, 113 S.Ct. 2891, 2917, 125 L.Ed.2d 612 (1993) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)); *Monette v. Electronic Data Systems Corp.,* 90 F.3d 1173, 1189 (6th Cir.1996).

Consequently, a complaint will not be dismissed pursuant to Rule 12(b)(6) unless there

is no law to support the claims made, the facts alleged are insufficient to state a claim, or there is an insurmountable bar on the face of the complaint. Because a Rule 12(b)(6) motion to dismiss is directed solely to the complaint, *Haffey v. Taft*, 803 F.Supp. 121, 127 (S.D.Ohio 1992) (citing *Roth Steel Prods. v. Sharon Steel Corp.*, 705 F.2d 134, 155 (6th Cir.1983)), and any exhibits attached to the complaint, *see* 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1327, at 764–65 (2nd ed.1990), the focus is on whether the plaintiff is entitled to offer evidence to support the claims, rather than on whether the plaintiff will ultimately prevail. *Scheuer*, 416 U.S. at 236, 94 S.Ct. at 1686; *Haffey*, 803 F.Supp. at 127.

While a court may not grant a Rule 12(b)(6) motion based on the disbelief of a complaint's factual allegations, *Lawler v. Marshall*, 898 F.2d 1196, 1199 (6th Cir.1990), the court "need not accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir.1987). Bare assertions of legal conclusions are not sufficient. *Sogevalor S.A. v. Penn Central Corp.*, 771 F.Supp. 890, 893 (S.D.Ohio 1991).

## III. *DISCUSSION*

### A. *Can Collective Bargaining Agreements Compel the Arbitration of Individual Statutory Rights?* [6]

In resolving the question of whether the nondiscrimination clause in the collective bargaining agreement can compel the arbitration of Dalton's Title VII and § 1981 claims, the Court does not write upon a clean slate. Each party has marched in front of the Court their favorite Supreme Court opinion in the hopes of advancing their respective positions. The Plaintiff heralds the Supreme Court's decision in *Alexander v. Gardner–Denver Company*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). For their part, the

Defendants have as their champion the Supreme Court's decision in *Gilmer v. Interstate/Johnson Lane Corporation*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). Faced with these opposing Supreme Court opinions, the Court's task "is to examine the precedential orbit of the two decisions and decide which one this case falls within." *Brisentine v. Stone & Webster Engineering Corp.*, 117 F.3d 519, 522 (11th Cir.1997).

In *Alexander*, a union employee claimed that his discharge was racially motivated. The collective bargaining agreement that governed his employment provided that "there shall be no discrimination against any employee on account of race, color, religion, sex, national origin, or ancestry." 415 U.S. at 39, 94 S.Ct. at 1015. The collective bargaining agreement also established a mandatory four-step grievance procedure that culminated in binding arbitration. *Id.* at 40–41, 94 S.Ct. at 1015–16.

The union employee unsuccessfully grieved and arbitrated his discharge claim. The contractual remedies provided in the collective bargaining agreement having failed, the employee brought a Title VII suit against his employer in federal court. *Id.* at 43, 94 S.Ct. at 1017. The employer argued that the union employee's Title VII suit was barred by the binding arbitration clause in the collective bargaining agreement.

The Supreme Court rejected this argument. Instead, the Court held that "Title VII's purpose and procedures strongly suggest that an individual does not forfeit his private cause of action if he first pursues his grievance to final arbitration under the nondiscrimination clause of a collective-bargaining agreement." *Alexander*, 415 U.S. at 49, 94 S.Ct. at 1020. In other words, "a unanimous Supreme Court held that a person may sue under Title VII notwithstanding [the fact] that he has submitted his claims to

---

**6.** The Defendants have argued that this Court's decision in *Brummett v. Copaz Packing Corp.*, 954 F.Supp. 160 (S.D.Ohio 1996) (Beckwith, J.), compels the Court to hold that Title VII claims are subject to a arbitration clause contained in a collective bargaining agreement. This Court, however, has been on both sides of this issue. *Compare Brummett*, 954 F.Supp. 160 (holding that Title VII claims are subject to mandatory arbitration pursuant to the terms of a collective

bargaining agreement) *with Nichols v. General Motors Co.*, 978 F.Supp. 743 (S.D.Ohio 1997) (Hogan, Mag. J.,) (holding that Title VII claims are not subject to an arbitration clause contained in a collective bargaining agreement). Given this fact, the Court is not bound by its prior decisions and is free to engage in a plenary review of the topic of whether a collective bargaining agreement can compel the arbitration of Title VII suits.

arbitration under a collective bargaining agreement and lost." *Austin v. Owens–Brockway Glass Container, Inc.,* 78 F.3d 875, 886 (4th Cir.1996) (Hall, J., dissenting). This expansion of the remedial options available to a union employee flow from the fact that "Title VII was designed to supplement rather than supplant, existing laws and institutions relating to employment discrimination." *Alexander,* 415 U.S. at 48–49, 94 S.Ct. at 1020.

In addition, the Court stated that "there can be no prospective waiver of an employee's rights under Title VII." *Id.* at 51, 94 S.Ct. at 1021. In reaching this conclusion, the Court began by noting that, although "a union may waive certain statutory rights related to collective activity, such as the right to strike," *id.,* the sole purpose for allowing such a waiver was to foster collective bargaining in the unionized context. *Id.* "Title VII, on the other hand, stands on plainly different ground; it concerns not majoritarian processes, but an individual's right to equal employment opportunities." *Id.* Such rights, therefore, "can form no part of the collective-bargaining process since waiver of these rights would defeat the paramount congressional purpose behind Title VII." *Id.*

After *Alexander,* the Supreme Court continued to adhere to the view that contractual and individual statutory rights were "distinctly separate [in] nature." 415 U.S. at 50, 94 S.Ct. at 1020–21; *see McDonald v. City of West Branch,* 466 U.S. 284, 290, 104 S.Ct. 1799, 1803, 80 L.Ed.2d 302 (1984) (applying *Alexander* to a claim brought under 42 U.S.C. § 1983); *Barrentine v. Arkansas–Best Freight Sys., Inc.,* 450 U.S. 728, 745, 101 S.Ct. 1437, 1447, 67 L.Ed.2d 641 (1981) (applying the rationale in *Alexander* to a claim under the Fair Labor Standards Act). As in *Alexander,* the Court "expressed its concern that the 'majoritarian' nature of the collective bargaining process 'in which the balancing of individual and collective interests occurs, might lead a union to sacrifice statutorily granted benefits.'" *Martin v. Dana Corp.,*

1997 WL 313054 (3rd Cir.) (quoting *Randolph v. Cooper Indus.,* 879 F.Supp. 518, 521 (W.D.Pa.1994)), *vacated by* 114 F.3d 428 (3rd Cir.1997). Because of the inherent tension between individual and group interests in the unionized work setting, the Court concluded that the union was not the appropriate body to barter the "statutory rights conferred by Congress on individual employees." *Randolph,* 879 F.Supp. 518, 521 (W.D.Pa.1994) (citing *Barrentine,* 450 U.S. at 742, 101 S.Ct. at 1445–46).

*Alexander* and its progeny, however, are not the only word from the Supreme Court on the question of whether federal antidiscrimination statutory rights are subject to arbitration. The Defendants contend that the Supreme Court's decision in *Gilmer* fundamentally altered the method by which to analyze the issue. In that case, a stockbroker, as a condition of his employment with a brokerage firm, individually agreed to sign a broker registration agreement with the New York Stock Exchange. In this registration agreement, the stockbroker agreed to arbitrate any dispute arising out of his employment with a brokerage firm that was a member of the Exchange. When he was fired at the age of 62, the stockbroker filed suit in federal court claiming that his employer had discriminated against him in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"). 29 U.S.C. § 621 *et seq.* His employer argued that the stockbroker's ADEA claim should be submitted to arbitration pursuant to the terms in the registration agreement.

The Supreme Court agreed. The Court held that an ADEA claim "can be subjected to compulsory arbitration pursuant to an arbitration agreement in a securities registration application." *Gilmer,* 500 U.S. at 23, 111 S.Ct. at 1650. Therefore, because the individual employee had "made the bargain to arbitrate," he was under the burden "to show that Congress had intended to preclude a waiver of a judicial forum for ADEA claims." [7] *Id.* at 26, 111 S.Ct. at 1652. After

---

7. The Defendants have argued that through the passage of the Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071 (1991), and in particular, § 118 of the Act, Congress expressly favored the arbitration of Title VII and other antidiscrimination statutory rights. The force of this argument, however, is undermined by the legisla-

tive history surrounding the passage of § 118. In the House Report that accompanied the Act, Congress made it clear that in passing § 118, it did not mean to foreclose an individual plaintiff's remedial options, but rather, meant to multiply them. "The Committee emphasizes, however,

examining the ADEA's statutory language and its legislative history, the Court concluded that Congress had not expressed any intention to prevent the arbitration of ADEA claims. *Id.* Having failed to carry his burden, the Court ordered that the stockbroker's claim be submitted to arbitration.

At this point, it is important to note what *Gilmer* did not hold. Despite the Defendants vigorous statements to the contrary, *Gilmer* did not overrule *Alexander* and its progeny. *See Livadas v. Bradshaw,* 512 U.S. 107, 127 n. 21, 114 S.Ct. 2068, 2080 n. 21, 129 L.Ed.2d 93 (1994) ("*Gilmer* emphasized its basic consistency with our unanimous decision in *Alexander.*"). The Court in *Gilmer* did reject the views expressed in *Alexander* that demonstrated a mistrust of the arbitral process. 500 U.S. at 34 n. 5, 111 S.Ct. at 1656 n. 5. However, the Supreme Court also explicitly distinguished *Alexander* on three grounds. The Court will consider these three distinctions in resolving which precedent the present case more closely resembles.

First, the *Gilmer* Court drew the distinction that the issue in *Alexander* did not involve the enforceability of an agreement to arbitrate statutory claims. Instead, *Alexander* dealt with the question of whether arbitration of *contractual rights* prevented the judicial resolution of statutory rights. *Gilmer,* 500 U.S. at 35, 111 S.Ct. at 1656–57. As the labor arbitrator had only the limited authority to interpret contractual rights set forth in the collective bargaining agreement, the agreement to arbitrate in *Alexander* could not preclude subsequent suits based on statutory rights. *Id.* In contrast, the registration agreement in *Gilmer* incorporated both contractual and statutory rights. The collapse of the distinction between contractual and statutory rights in the registration agreement in *Gilmer* raised "quite different [a] issue" than the issue considered in *Alexander. Id.* at 35, 111 S.Ct. at 1656–57.

■ Much like in *Alexander,* the collective bargaining agreement between JSC and the Union confines the arbitrator's authority to resolve workplace disputes to determining the interpretation, the application of, or the compliance with the agreement's provisions. Unlike *Alexander,* one of the provisions in the collective bargaining agreement specifically incorporates the federal antidiscrimination statutory rights at issue in this case. As a result, an arbitrator interpreting the provisions of the JSC collective bargaining agreement is permitted to rely on "external" or "statutory" law. In effect, the parties have agreed to be bound by the arbitrator's analysis of Title VII and the other federal antidiscrimination statutes. Therefore, the first distinction the Supreme Court drew between *Gilmer* and *Alexander* pulls the present case closer to *Gilmer.*

The second distinction drawn by the *Gilmer* Court dealt with the "tension between collective representation and individual statutory rights." 500 U.S. at 35, 111 S.Ct. at 1657. The *Gilmer* Court noted that the bargaining process in the unionized setting permitted the possibility that "the interests of the individual employee may be subordinated to the collective interests of all employees in the bargaining unit." *Id.* at 34, 111 S.Ct. at 1656 (quoting *Alexander,* 415 U.S. at 58, n. 19, 94 S.Ct. at 1024, n. 19). Such concern over the possible divergence of interests between those who negotiate an agreement and those who are bound by that agreement was not present in *Gilmer.* Although the stockbroker had been forced to sign a contract of adhesion as a condition of his employment, there at least existed the legal fiction that he individually bargained for and consented to the inclusion of the arbitration clause in the registration agreement. 500 U.S. at 26, 111 S.Ct. at 1652; *Pryner v. Tractor Supply Co.,* 109 F.3d 354, 364 (7th Cir.), *petition for cert. filed,* 65 U.S.L.W. 3783 (U.S. May 16, 1997) (No. 96–1830); *Krahel v. Owens–Brockway*

that the use of alternative dispute resolution mechanisms is intended to supplement, not supplant, the remedies provided by Title VII. Thus, for example, the Committee believes that any agreement to submit disputed issues to arbitration, whether in the context of a collective bargaining agreement or in an employment contract, does not preclude the affected person from

seeking relief under the enforcement provisions of Title VII. This view is consistent with the Supreme Court's interpretation of Title VII in *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974)." H.R. No. 40(I), 102 Cong., 1st Sess. 97 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 635.

*Glass Container, Inc.*, 971 F.Supp. 440, 448–49 (D.Or.1997) . In contrast, no similar assumption is possible in the unionized work setting. Much of this dissimilarity stems from the prominent role unions play in the negotiation of collective bargaining agreements and in the resolution of workplace disputes.

The provisions in collective bargaining agreements are "negotiated by the union [that has been] elected by a majority of the workers in the bargaining unit. . . ." *Pryner*, 109 F.3d at 362. Furthermore, the provisions are binding on all the members of the union regardless of whether they are part of the majority that voted in favor of the agreement. "Since a union's objective is to maximize overall compensation of its members, not to ensure that each employee receives the best compensation deal available, a union balancing individual and collective interests might . . . permit some employees' statutorily granted [rights] to be sacrificed if an alternative expenditure of resources would result in increased benefits for workers in the bargaining unit as a whole." *Barrentine*, 450 U.S. at 742, 101 S.Ct. at 1446. This possible compromise of individual statutory rights is even more troubling in the context of Title VII and other federal antidiscrimination statutory rights. Such rights have been given to "members of minority groups because of [the] concern about the mistreatment (of which there is a long history in the labor movement) of minorities by majorities." *Pryner*, 109 F.3d at 362. If unions were permitted to make decisions concerning such statutory rights, it would, in effect. deliver "the enforcement of the rights of these minorities into the hands of the majority." *Id.* at 363. Such a result turns the policy objective underlying the antidiscrimination statutes upon its head and is not "justified by the abstract desirability of allowing unions and employers to cut their own deals." *Id.* Furthermore, given the fact that only nine of the one hundred fifty members of the Union at the Blue Ash plant were African–American, "[i]t would appear . . . that the tension between individual and collective rights spills over to a tension between racial minority and majority rights." *Martin*, 1997 WL 313054 at \*9 (Scirica, J., dissenting).

The bargaining process in the collective bargaining context, however, is not the only basis for concern. The manner in which workplace disputes are handled through the grievance and arbitration machinery provided in the JSC collective bargaining agreement further illustrates *Gilmer's* concern with the tension between collective and individual interests. As noted earlier, the grievance and arbitration procedure in the JSC collective bargaining agreement places the individual employee's grievance into the hands of the Union. After the initial filing of the grievance by the employee, the Union decides how and when to prosecute the grievance, if it decides to prosecute the grievance at all. Furthermore. only the Union can seek to have the employee's grievance submitted to arbitration. As a result, "[t]he worker has to persuade the union to prosecute his grievance and if it loses in the early stages of the grievance proceedings to submit the grievance to arbitration." *Pryner*, 109 F.3d at 362.

The Defendants attempt to downplay the significance of this by noting that if the union acts in bad faith in failing to pursue an employee's grievance, then the employee can bring suit against the union for breaching its duty of fair representation. See 29 U.S.C. § 185. This argument, however, only further illustrates the predicament the JSC collective bargaining agreement creates for employees who wish to pursue their statutory rights. Instead of having to bring a single suit to determine the merits of their discrimination claims, union employees operating under the JSC agreement face the daunting possibility of having to bring two suits in order to enforce their statutory rights-first, the employee must bring a suit against the union to force it to grieve and if necessary arbitrate the grievance, and second, the employee must bring the grievance and arbitration proceeding itself. Furthermore, in bringing the breach of duty of fair representation claim, the employee will encounter a judicial system that allows unions broad discretion in deciding whether or not to prosecute workplace grievances. *Vaca v. Sipes*, 386 U.S. 171, 191–92, 87 S.Ct. 903, 917, 17 L.Ed.2d 842 (1967). In addition to the broad discretion unions enjoy in making such decisions, the

Sixth Circuit has indicated that it reviews such decisions with a great deal of deference. *Nida v. Plant Protection Ass'n National*, 7 F.3d 522, 526 (6th Cir.1993). The end result is that a JSC employee who wishes to pursue his or her statutory rights "cannot have great confidence either that [the union] will do so or that if it does not the courts will intervene and force it to do so." *Pryner*, 109 F.3d at 362. For all of these reasons, the second distinction drawn by the Court between *Gilmer* and *Alexander* moves this case closer to the *Alexander* side.

The third distinction the Court drew was that the ADEA claim in *Gilmer* was encompassed within the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, which "reflects a 'liberal federal policy favoring arbitration agreements.'" 500 U.S. at 35, 111 S.Ct. at 1657 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 625, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985)). By contrast, the collective bargaining agreement in *Alexander* was not decided within the backdrop of the FAA. *Id.* The Sixth Circuit has consistently held that collective bargaining agreements are outside the scope of the FAA. *Asplundh Tree Expert Co. v. Bates*, 71 F.3d 592, 601 (6th Cir.1995); *Willis v. Dean Witter Reynolds, Inc.*, 948 F.2d 305, 311 (6th Cir.1991); *Bacashihua v. USPS*, 859 F.2d 402, 404–05 (6th Cir.1988). As the present case arises in the context of an arbitration clause contained in a collective bargaining agreement, the third distinction places this case along the *Alexander* line of authority.

Therefore, in two out of the three ways that *Gilmer* distinguished *Alexander* and its progeny, this case is closer to *Alexander* than *Gilmer*. Although these distinctions may seem to have cut *Alexander* so far back as to deprive the case of any real significance, the issue of the continued viability of *Alexander* after the decision in *Gilmer* is one left for the Supreme Court, and not this Court, to decide. As the Supreme Court has warned: "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shear-*

*son/American Express Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 1921–22, 104 L.Ed.2d 526 (1989). Therefore, this Court is bound to follow the reasoning in *Alexander* when an employer or a union, under the terms of a collective bargaining agreement, seeks to send a worker's federal antidiscrimination statutory rights to binding arbitration. Until *Alexander* has been overruled, an individual employee's Title VII statutory rights cannot serve as a bargaining chip for the unions to use for the benefit of all members of the bargaining unit.

Accordingly, the Court **DENIES** the Defendants' Motion to Dismiss the Plaintiff's Title VII and § 1981 claims.

### B. Section 301 Preemption

Section 301(a) of the LMRA provides that [s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties. 29 U.S.C. § 185(a). Although a reading of the statute would seem to convey a rather modest purpose, *i.e.*, providing federal courts with jurisdiction over labor disputes, § 301 has been imbued by the Supreme Court with more substantive meaning and effect. "[W]e [have] held that § 301 not only provides federal-court jurisdiction over controversies involving collective-bargaining agreements, but also 'authorizes federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements.'" *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 403, 108 S.Ct. 1877, 1880, 100 L.Ed.2d 410 (1988) (quoting *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 451, 77 S.Ct. 912, 915, 1 L.Ed.2d 972 (1957)). Consequently, "if the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law ... is pre-empted" and the claim must be submitted to the grievance and arbitration procedure provided for in the collective bargaining agreement. *Lingle*, 486 U.S. at 405–06, 108 S.Ct. at 1881–82 (citing *Allis-*

*Chalmers Corp. v. Lueck*, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985)). In providing § 301 with a preemptive effect over state law claims, the Supreme Court meant to "prevent inconsistent interpretations of the substantive provisions of collective bargaining agreements." *Smolarek v. Chrysler Corp.*, 879 F.2d 1326, 1329 (6th Cir.1989) (en banc).

In clarifying its definition of when a state law claim is subject to § 301 preemption, the Court has noted that the mere fact that there exists some factual overlap between the state law claim and a provision in the collective bargaining agreement is not sufficient to warrant § 301 preemption. "[E]ven if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes." *Lingle*, 486 U.S. at 409–10, 108 S.Ct. at 1883.

With this understanding, the Sixth Circuit has established a two-part test to determine when § 301 preemption is appropriate. "First, the district court must examine whether proof of the state law *claim* requires interpretation of collective bargaining agreement terms. Second, the court must ascertain whether *the right claimed by the plaintiff* is created by the collective bargaining agreement or by state law. If the *right* both is borne of state law and does not invoke *contract interpretation*, then there is no preemption." *DeCoe v. General Motors Corp.*, 32 F.3d 212, 216 (6th Cir.1994) (emphasis added). The fact that a provision of the collective bargaining agreement provides a defendant with a defense to the plaintiff's state law claim will not trigger § 301 preemption. *DeCoe*, 32 F.3d at 216; *Smolarek*, 879 F.2d at 1333.

In measuring a plaintiff's state law claim against the first part of the Sixth Circuit test, the court must look beyond the plaintiff's characterization of its claim in order to determine whether the plaintiff has simply disguised what in reality is a contract action for the breach of duties outlined in the collective bargaining agreement as a tort. *DeCoe*, 32 F.3d at 216.

Here, the Defendants argue that the Plaintiff's state law claims for a racially hostile work environment, retaliation and intentional infliction of emotional distress involve the interpretation of the JSC collective bargaining agreement and, therefore, are preempted by § 301.

### 1. Dalton's Ohio Civil Rights Act Claims for a Racially Hostile Work Environment and for Retaliation

■ In determining the elements necessary to establish a hostile work environment claim under the Ohio Revised Code § 4112.02, Ohio courts have looked to the elements federal courts have used for similar claims under Title VII. *See Garcia v. ANR Freight Sys., Inc.*, 942 F.Supp. 351, 358 (N.D.Ohio 1996) (noting that the elements for a sexually hostile work environment under Ohio law are the same as those under Title VII). Thus, in order to establish a cause of action for a racially hostile work environment under Ohio Revised Code § 4112.01, Dalton must prove that (1) the alleged racial harassment constituted an unreasonably abusive or offensive work-related environment or adversely affected the reasonable employee's ability to do his or her job and (2) that the employer knew or should have known of the alleged conduct and failed to take prompt remedial action. *Davis v. Monsanto Chemical Co.*, 858 F.2d 345, 349 (6th Cir.1988).

■ None of the elements necessary for Dalton to establish his hostile work environment claim are remotely covered by the provisions of the collective bargaining agreement. The Defendants cannot (and do not) contend that provisions of the JSC collective bargaining agreement condone, much less encourage, the exhibition of racially abusive conduct. Nor does the agreement attempt to define which forms of racially abusive conduct is allowed and which are frowned upon. In short, the establishment of a state law claim concerning a hostile work environment "can be resolved without interpreting the agreement itself. . . ." *Lingle*, 486 U.S. at 410, 108 S.Ct. at 1883. Consequently, Dalton's hostile work environment claim is not preempted by § 301.

■ In establishing the elements for a retaliation claim under Ohio Revised Code § 4112.02, the Ohio Supreme Court has adopted the elements utilized for establishing such a claim under Title VII. *Degnan v. Goodwill Indus.*, 104 Ohio App.3d 589, 662 N.E.2d 894, 900 (1995). Accordingly, for Dalton to establish a *prima facie* case of retaliation under Ohio Revised Code § 4112.02, he must demonstrate that he "(1) engaged in activity protected by the statute, (2) that the exercise of his civil rights was known to the defendant, (3) that the defendant thereafter took employment action adverse to the plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action." *Joiner v. Ohio Dep't of Transportation*, 949 F.Supp. 562, 568 (S.D.Ohio 1996) (citing *Harrison v. Metropolitan Gov't*, 80 F.3d 1107, 1118 (6th Cir.1996)).

■ If Dalton is able to establish a *prima facie* case, the burden then shifts to the Defendants to articulate a legitimate, nondiscriminatory reason for their conduct. *Id.* at 569. Should the Defendants succeed in articulating such a justification, the burden then reverts to Dalton to establish than the Defendants' proffered justification is a pretext for unlawful retaliation. *Id.*

■ The Defendants argue that Dalton's retaliation claim is preempted because they would rely on provisions contained in the collective bargaining agreement as their legitimate, nondiscriminatory reason for why they disciplined Dalton after he filed his EEOC complaint in 1995. Specifically, the Defendants claim that the collective bargaining agreement provision authorizing JSC to discipline its employees would have to be consulted in determining whether the Defendants had articulated a legitimate, nondiscriminatory reason for their conduct. The Defendants argument, however, has been foreclosed by the Supreme Court's decision in *Lingle*.

In *Lingle*, an employee, claiming that he had been terminated for exercising his rights under the Illinois Worker Compensation Act, brought a state law claim for retaliatory discharge against his employer. Much like Dalton's retaliation claim, in order for the employee in *Lingle* to prove retaliatory dis-

charge, he had to show that he was discharged and that the employer's motive in discharging him was a result of him exercising rights provided for under the Act. 486 U.S. at 407, 108 S.Ct. at 1882. More importantly, an employer could defend against a retaliatory discharge claim by articulating a nonretaliatory reason for the discharge. *Id.* In response to the employer's argument that the articulation of such a nonretaliatory justification would require the interpretation of the collective bargaining agreement, the Supreme Court noted: "Each of these purely factual questions pertains to ... the conduct and motivation of the employer. Neither of the elements requires a court to interpret any term of a collective-bargaining agreement." *Id.* In this case, as in *Lingle*, Dalton's state law claim for retaliation exists independently from the provisions of the collective bargaining agreement. Therefore, § 301 preemption is inappropriate, and the Court **DENIES** the Defendants' Motion to Dismiss the Plaintiff's Ohio Civil Rights Act claims.

### 2. Dalton's Intentional Infliction of Emotional Distress Claim

■ To establish a claim for intentional infliction of emotional distress, Dalton must demonstrate that "(1) the defendant intended to cause the plaintiff serious emotional distress, (2) that the defendant's conduct was extreme and outrageous, and (3) that the defendant's conduct was the proximate cause of the plaintiff's serious emotional distress." *Phung v. Waste Management, Inc.*, 71 Ohio St.3d 408, 644 N.E.2d 286, 289 (1994).

■ Whether Dalton's intentional infliction of emotional distress claim is preempted turns upon whether the second element, that the defendant acted outrageously, requires interpretation of the collective bargaining agreement. To that end, the Sixth Circuit has noted that a defendant has not acted outrageously " 'where he has done no more than to insist upon his legal rights in a permissible way, even though he was well aware that such insistence was certain to cause emotional distress.' " *DeCoe*, 32 F.3d at 219 (quoting *Polk v. Yellow Freight Sys., Inc.*, 801 F.2d 190, 196 (6th Cir.1986)).

Therefore, if the allegedly outrageous conduct was the result of the Defendant exercising a right provided for under the collective bargaining agreement, then Dalton's intentional infliction of emotional distress claim is preempted. *Id.* Before discussing whether Dalton's intentional infliction of emotional distress claim is preempted it is important to note that Dalton has brought this cause of action against the defendant Boyd only. Therefore, whether Dalton's claim is ultimately preempted must be determined by looking solely to whether Boyd's allegedly outrageous conduct was the result of him exercising rights provided for in the collective bargaining agreement.

After considering all of the instances in which Boyd could be considered to have acted outrageously, the Court finds that on none of these occasions was Boyd exercising a right provided by the collective bargaining agreement. The racial slurs, the threats of physical violence, and the endangerment of Dalton's life through the misuse of the cherry-picker all exist without the imprimatur of rights provided in the collective bargaining agreement. Similarly, nothing in the collective bargaining agreement even vaguely permits a supervisor to keep an employee at work when suffering from a major medical condition requiring immediate treatment. In fact, JSC's company policy (not delineated in the collective bargaining agreement) allows employees to leave work when they are sick. As the outrageous conduct that forms the basis of the intentional infliction of emotional distress claim was not the result of Boyd exercising his rights under the collective bargaining agreement, § 301 preemption does not apply.

Accordingly, the Court **DENIES** the Defendants' Motion to Dismiss the Plaintiff's intentional infliction of emotional distress claim.

## C. Liability of the Individual Defendants

Dalton alleges in his complaint that the individual Defendants—Boyd, Brooks, Wiechel, Wholihan, and Flamm—were his supervisors and hence were the agents of JSC. Compl. ¶¶ 4–8. He therefore sued each of them individually for violating his rights under Title VII, Ohio Revised Code § 4112.02, and 42 U.S.C. § 1981. The De-

fendants maintain that they cannot be held individually liable because only an "employer" is subject to liability under those statutes. Therefore, as employees/supervisors, the Defendants argue they do not qualify as an "employer." With these arguments in mind, the Court turns to the merits of the Defendants' argument.

### 1. Liability of Individual Defendants Under Title VII

 Title VII provides that "it shall be an unlawful employment practice for an employer" to discriminate against an individual on the basis of "race, color, religion, sex. or national origin." 42 U.S.C. § 2000e-2(a). The statute defines an "employer" as connoting "a person engaged in an industry affecting commerce who has fifteen or more employees ... and any agent of such a person." 42 U.S.C. § 2000e(b). Although the term "agent" is not defined in the statute, the Sixth Circuit has interpreted "agent" to mean "an individual who 'serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing or conditions of employment.' " *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 803 (6th Cir.1994) (quoting *Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir.1993)).

Dalton contends that because the Defendants acted in their supervisory roles, the statute allows him to sue them individually as "agents" of JSC. This argument, however, has recently been rejected by the Sixth Circuit. In *Wathen v. General Electric Company*, the Sixth Circuit determined that "Congress did not intend to provide for individual employee/supervisor liability under Title VII." 115 F.3d 400, 405 (6th Cir.1997). The *Wathen* Court held that this result was compelled by Title VII's statutory language, its legislative history, and the case law interpreting it. *Id.* at 406. Therefore, as a matter of law, the individual Defendants in the present case cannot be held personally liable under Title VII. Accordingly, the Title VII claims against the Individual Defendants are hereby **DISMISSED** for failure to state a claim upon which relief may be granted.

**2. _Individual Liability Under Ohio Revised Code § 4112.02_**

■■■ Ohio Revised Code § 4112.02 sets forth unlawful discriminatory practices, and Ohio Revised Code § 4112.99 authorizes a civil cause of action for violations of § 4112.02. In relevant part, § 4112.02 states: "It shall be an unlawful discriminatory practice ... [f]or any employer, because of race, color, religion, ... national origin, ... or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

Ohio Revised Code § 4112.01 defines the key term "employer." " 'Employer' includes ... any person employing four or more persons within the state, _and any person acting directly or indirectly in the interest of the employer._" _Id._ (emphasis added).

Dalton argues that he states a claim under § 4112.02 upon which relief may be granted against the individual Defendants for their allegedly discriminatory practices. There are at least two reasons why this is not so.

First, employers themselves have long been found to be liable for discriminatory practices in employment. Likewise, employers have found themselves to be liable for the discriminatory practices of certain individuals, namely, their employees and agents through the doctrine of respondeat superior. However, individuals themselves generally have not been found liable in their individual capacity. Dalton argues that the clause "any person acting ... in the interest of the employer" authorizes a cause of action against an individual in his or her individual capacity.

The clause "any person acting ... in the interest of the employer" was meant merely to clarify that respondeat superior liability could be found—that employers may be found liable for the acts of their employees or agents through the doctrine of respondeat superior for the discriminatory practices of their employees or agents. _Osman v. Isotec, Inc.,_ 960 F.Supp. 118, 120–21 (S.D.Ohio 1997); _accord Gausmann v. City of Ashland,_ 926 F.Supp. 635, 640–41 (N.D.Ohio 1996).

Second, the Supreme Court of Ohio has determined, as a general matter, that federal case law interpreting Title VII is applicable to cases involving alleged violations of Ohio Revised Code § 4112.02. _Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n,_ 66 Ohio St.2d 192, 421 N.E.2d 128, 131 (1981). In light of the Sixth Circuit's decision in _Wathen_ rejecting individual liability under Title VII, the Court finds that there is no basis for individual liability under Ohio Revised Code § 4112.02. Accordingly, the Ohio Revised Code § 4112.02 claims against the individual Defendants are hereby **DISMISSED** for failure to state a claim upon which relief may be granted.

**3. _Individual Liability Under 42 U.S.C. § 1981_**

■■■ Section 1981(a) provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens." The statute defines the phrase "to make and enforce contracts" as encompassing "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

The Defendants contend that because the Civil Rights Act of 1991 provides that § 1981 should be analyzed in the same manner as Title VII, there is no individual liability under § 1981. However, this reliance on the 1991 Act is misplaced. The rationale for rejecting individual liability under Title VII is driven by the statute's language. In denying individual liability under Title VII, the _Wathen_ Court stressed the fact that Title VII imposes liability only upon "employers." 115 F.3d at 406. The fact that the statute premised liability upon the acts of agents was merely "to incorporate respondeat superior liability into the statute." _Id._ No similar statutory limitation or the reach of § 1981 liability exists. _See_ 42 U.S.C. § 1981(c). "Although Section 1981 is a federal civil rights remedy[,] it is in the nature of a tort remedy." _Al–Khazraji v. Saint Francis College,_ 784 F.2d 505, 518 (3d Cir.1986) Incorporating principles of tort law, courts have held

that individuals may be held liable for injuries suffered by third parties "when they intentionally cause an infringement of rights protected by Section 1981, regardless of whether the corporation may also be held liable." *Id.* (*citing Faraca v. Clements,* 506 F.2d 956, 959 (5th Cir.1975)).

Accordingly, the Court hereby **DENIES** the Defendants' Motion to Dismiss the Plaintiff's § 1981 claims.

## IV. CONCLUSION

For the reasons and in the manner set forth above. the Defendants' Motion to Dismiss is hereby **GRANTED IN PART AND DENIED IN PART.**

**IT IS SO ORDERED.**